IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| ANTWUNE JENKINS | § | |
| v. | § | CIVIL ACTION NO. 6:23cv95 |
| CAPTAIN ARIEL BURKS, ET AL. | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

The Plaintiff Antwune Jenkins, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this lawsuit complaining of alleged violations of his rights. The lawsuit was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. 636(b)(1) and (3) and Local Rule CV-72 of the Local Rules of Court for the Eastern District of Texas. The named Defendants are Captain Ariel Burks, Sgt. Daryl Eason, and Sgt. Timothy Larsen; of these, Sgt. Eason has previously been dismissed.

**I. Plaintiff's Claims**

Plaintiff states that on February 2, 2021, he was sitting on the floor in his cell because he had fallen a number of times while trying to use his walker. There was "some type of situation" which caused Captain Burks to come to X Wing, but Plaintiff could not see what happened because he was on the floor. He could tell Burks was there because he recognized her voice.

Plaintiff says that Sgt. Eason and other officers came to his cell and told him to get up, which he did. He grabbed hold of his walker and sat on it. An African officer told him to strip out, and after he did, the officer gave him back his boxer shorts to put on. The officer then opened the door and handcuffed one of Plaintiff's hands to the walker. As Plaintiff went out the door, Captain Burks stopped him and told the officer to re-handcuff him. Plaintiff was then handcuffed behind his back and he sat down on the walker.

Plaintiff stated that the officers had difficulty walking him out the door because they were carrying his weight. He heard someone say that there was nothing wrong with him. When he got outside the cell, she [apparently meaning Captain Burks] told him to stand against the wall. He protested this order and sat down in a chair. Plaintiff states that "she knows I been complaining about my back and legs and being assigned the wrong [sic] because complained to her before."

Plaintiff complains that the officers went into his cell and started taking all of his property, including clothes, underwear, socks, sheets, towels, shoes, appliances, and the obituaries of his grandmother and his son, causing him to become agitated. The officers then picked him up and carried him over their heads back into the cell, where they sat him down on the floor and left.

According to Plaintiff, Sgt. Larsen told him to get up and walk over to the door and give up the handcuffs, even though Larsen knew Plaintiff was unable to do that. Plaintiff states that he has been telling the officers about his condition since December of 2020. He explains that he was placed on X Wing because his medical records show that a spine specialist said he should be in a wheelchair at all times. He says that "Warden Weaver and Lt. McGee got involved and put me back in transit to be re-transferred from the Beto Unit because I was not [to] be there in the first place, I had just got shipped off." (Docket no. 1, p. 5).

After Sgt. Larsen told him to get up and relinquish the handcuffs, Plaintiff states that he put his face in the corner where the floor meets the wall, so that the handcuffs were exposed. A team came into the cell and removed the handcuffs without incident.

Plaintiff states that he was "in a lot of pain and hurt" because of the taking of his son's obituary. He says that his son's funeral was televised because it was held at the Dallas Cowboys football stadium on January 6, 2021. He begged the officers not to take the obituary because it was all he had left of his son.

Plaintiff asserts that the officers were "trying to provoke him to walk" by threatening to use force on him, apparently to show that he can in fact walk. He states that he knew there was something wrong with his back because of the pain he was feeling, but "since I been there they

always said it was nothing wrong with me and I was faking, and always harassing me, trying to make me do something I cannot do and always threatening to jump on me and I guess this time was their opportunity." (Docket no. 1, p. 5). He claims the officers said it was not documented in his medical file, but explains that it was not documented because they don't escort him to his appointments. He said that he had a 50 yard walking restriction, and for distances greater than 50 yards, he required a wheelchair according to policy.

Plaintiff states that Sgt. Larsen ordered him to get up and threatened to use chemical agents. Plaintiff could not stand up, so he got under the bunk. Sgt. Larsen sprayed Plaintiff with the chemical agents and he started choking and thought he was going to die. He started to panic and tried to grab his walker, but fell hard; he thinks this is what caused his spine to collapse. However, he says that "Sgt. Larsen did not show any sympathy," so Plaintiff pulled down his boxers and lay on the floor, coughing and gagging.

Afterwards, Plaintiff contends that he was left in the cell for six days with chemical agents all over the cell and over him. Captain Burks put a yellow sign outside his door saying not to let him out of the cell for any reason. Plaintiff states that the chemical agents burned his whole body and he had no towel and no soap, and even his C-Pap machine had chemicals all over it. All he could do was lay on his mat, and when food came, he had to eat with his hands.

On February 9, 2021, Plaintiff says that he "got a break" because he had an appointment with the ortho spine clinic. The prison officials had to give him a shower and clean clothes because they could not let him go to the hospital in the condition he was in. He saw the head of the ortho spine department, who told him that he had a life threatening condition, even though Captain Burks had told him seven days earlier that there was nothing wrong with him. The doctor said that Plaintiff had some bleeding and swelling, and if Plaintiff had an infection they would have to prep him for emergency surgery. Plaintiff says that he was admitted to the hospital and an emergency MRI was done, which Plaintiff says showed that he had a severe bone on bone collapse in the L5-S1 portion of the spine. Plaintiff attributes this to his falling when he was sprayed.

Plaintiff says that his property was taken and he was told that it was "altered," meaning he would not get it back, but Warden Breeden gave it back in a property settlement. He then states that Governor Gregg Abbott intervened and got him expedited off the unit. When he got a disciplinary case over the incident, it was only a minor case.

## II. The Motion for Summary Judgment

The remaining Defendants, Captain Burks and Sgt. Larsen, have filed a motion for summary judgment on the issue of exhaustion of administrative remedies. This motion states that between January 1 and August 1, 2021, Plaintiff filed numerous grievances. Of these, the Defendants state that Plaintiff identified grievance no. 2021676353 as exhausting his administrative remedies. However, the Defendants assert that this grievance concerned a disciplinary case, although it also complained that Burks handcuffed him behind his back, carried him into the cell, placed him on the floor, and ordered him to get up and walk despite knowing that he is disabled, and that he was sprayed and left in the cell. The Step One grievance did not mention Larsen. The response upheld the disciplinary case of which Plaintiff complained.

In his Step Two appeal, the Defendants state that Plaintiff did not explicitly complain of the disciplinary case but contended that handcuffs should not have been used on him. He said that he has back issues but the officers disregarded his disabilities. The Step Two appeal did not mention either Burks or Larsen. This grievance was rejected because the grievable time period had expired. The Defendants thus argue that Plaintiff did not exhaust his administrative remedies because the Step One grievance concerned the disciplinary case rather than the use of force and the Step Two grievance appeal was untimely.

In his response to the motion for summary judgment, Plaintiff argues that "the use of force / excessive use of force stems from the disciplinary, which there should not have been a use of force in the first place because the disciplinary was minor, and mostly all disciplinary that involves use of force stems from major infractions or disciplinary."

After complaining that the defendants are relying on "technicalities," Plaintiff asserts that he exhausted all remedies available to him because he was locked in a cell with nothing but a sign posted on the cell door, with chemical agents all over him, until they had to pull him out and clean him up for a scheduled neuro-spine appointment on February 9. He says that this condition could have resulted in a fatality.

Plaintiff argues that rules are intended to promote and not obstruct the administration of justice and enable the courts to do substantial justice rather than decide cases on technicalities which have no relationship to the parties or litigants. He attaches a number of exhibits, primarily consisting of medical records documenting his history of back problems, including spondylosis, degenerative changes at L5/S1, and grade one retrolisthesis of L5 over S1, as well as the restrictions he has received and his attempts to obtain a wheelchair pass.

In discussing his grievances in his complaint, Plaintiff states that he wrote a Step One grievance, which bears a notation that it was returned to him on March 25, 2021, but in fact he received it back on April 2. He wrote his Step Two grievance on April 4 and gave it to the officer on April 5, but he was told that his time had expired. He was told it had been received on April 15, but it is stamped "March 6" at the top, which Plaintiff says he thinks should be April 6. Plaintiff asserts that he was subjected to cruel and unusual punishment and that he suffered irreparable harm from deliberate indifference to his serious medical needs.

**III. The Relevant Grievance**

The only grievance in the summary judgment evidence to address the use of force is grievance no. 2021676353 (docket no. 30, p. 213). This grievance says "appeal case #20120109232" at the top. In the grievance, Plaintiff says that it concerns disciplinary case no. 20120109232 and is an appeal that will be presented in a civil suit of acts of discrimination and retaliation. He discusses the terms "protected class" and "retaliation" and states that the Americans with Disabilities Act prevents discrimination against persons with disabilities, including prisoners.

Plaintiff goes on to say that the events which have occurred up to that point are a "campaign of harassment." He states that he is engaging in protected conduct and unnamed prison officials are taking adverse action against him. He also asserts that he has a serious medical condition.

Plaintiff states in the grievance that the charge led by Captain Banks on video knowingly and intentionally cuffed him behind his back and carried him into his cell, placed him in the middle of the floor, and ordered him to get up and walk to give up the cuffs, knowing that he was disabled on a walker and in need of a wheelchair. Because they knew that he was unable to do what they wanted, they forced a situation on him knowing the outcome and wrote a disciplinary case behind it, which Plaintiff says is evidence of what took place. Plaintiff contends that the main reason for this is because he has two civil lawsuits which he is fighting and they are trying to make him walk on video. He says that "they hurt my right shoulder by cutting behind my back" and that the orthopedic department says he needs surgery.

Plaintiff complains that they stripped him out, coming out of his cell, and put him in a chair with only boxers and shower slides. They provoked him by taking his deceased son's picture and sprayed him because he was in too much pain to get up and strip. He reacted by trying to get up and fell again. They left him in the cell for five days without a shower, with spray all over his cell. All of his clothes were taken and he had nothing with which to clean his cell. His breathing machine was also contaminated. He went to Galveston on February 9 and had an emergency MRI, and the doctor told him that he had serious back problems which could become life threatening.

The response to this grievance says that a review of disciplinary case no. 20210109232 indicated that the preponderance of credible evidence was sufficient to warrant the decision and penalties imposed, and there were no technical or procedural errors noted.

In his Step Two grievance appeal, Plaintiff says that the main question is not whether he did not relinquish the handcuffs but whether he was supposed to be handcuffed behind his back. He says that he is disabled and has the use of a walker for mobility and that he is a fall risk even with his walker. Consequently, the ortho spine clinic recommended in 2020 that he be put in a

wheelchair at all times, because the doctor saw all of the bruises and cuts on his head from falling a lot.

Plaintiff requests that the regional directors be asked if they would handcuff an inmate behind his back if the inmate needed a walker. He also requested that the spine doctor be asked if he would recommend that Plaintiff be handcuffed behind his back without use of a walker, and if Plaintiff were handcuffed behind his back and placed in the middle of the floor, whether he could get up and walk some seven steps to the door without his walker, turn around, and bend over so the handcuffs could be removed.

Plaintiff states that he saw his spine doctor on February 9 and was told that he has a serious spine condition. Blood and urine work was taken along with an emergency X-ray and MRI. He also saw the Beto Unit provider on March 16, 2021 and she made notes about a cuff pass as well as a referral for wheelchair evaluation and a referral back to ortho because she cannot help him since he needs surgery.

Plaintiff further says that he has serious back issues and is a member of a protected class, as well as being protected under the ADA. The officers disregarded his physical disabilities and handled him as if he were whole. He should not have been handcuffed behind his back, and by doing so, he asserts that the officers caused the use of force to take place.

The Step Two grievance appeal is dated April 4, 2021, but it was received by the unit grievance investigator on April 15, 2021. The central grievance office received it on April 21. The grievance appeal was screened (i.e. returned unprocessed) because the grievable time period had expired.

As noted above, Plaintiff states in his complaint that the Step One grievance reflects that it was returned to him on March 25, 2021, but in fact he received it on April 2. He wrote it on April 4 and gave it to the officer on April 5, but he was told that his time had expired. He contends that inmates have 15 days from the return date to respond and this would have been April 9, but the grievance office claimed they got it on April 15. He states that at the top of the Step Two grievance

appeal, there is a stamp saying March 6, 2021, which he believes is supposed to be April 6; Plaintiff speculates that this is the date his grievance appeal was actually received. The copy of the grievance appeal attached to Plaintiff's complaint (docket no. 1-1, p. 9) bears what appears to be two superimposed stamps saying "MAR 06 2021," but the copy included in the Defendants' summary judgment evidence does not have these stamps.

**III. Discussion**

The law governing the exhaustion of administrative remedies is found in 42 U.S.C. § 1997e, which provides as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this statute, prisoners are required to exhaust available administrative remedies before filing suit in federal court. *Jones v. Bock*, 549 U.S. 199, 202, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004). The Fifth Circuit has held that "there can be no doubt that pre-filing exhaustion of administrative remedies is mandatory." *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012). The court went on to state that "district courts have no discretion to excuse a prisoner's failure to properly exhaust the prison grievance process before filing their complaint. It is irrelevant whether exhaustion is achieved during the federal proceeding. Pre-filing exhaustion is mandatory, and the case must be dismissed if available administrative remedies were not exhausted." *Id.*

Proper exhaustion is required, meaning the prisoner must not only pursue all available avenues of relief, but must also comply with all deadlines and procedural rules. *Woodford v. Ngo*, 548 U.S. 81, 89-95, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). This requirement means mere "substantial compliance" with administrative remedy procedures does not satisfy exhaustion; instead, prisoners must exhaust administrative remedies properly. *Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010); *see also Wilson v. Epps*, 776 F.3d 296, 299 (5th Cir. 2015) (the court looks to

the applicable procedural rules defined by the prison grievance process itself in order to determine what remedies are available and thus must be exhausted).

All of the steps in a facility grievance procedure must be pursued in order to exhaust administrative remedies. *Johnson*, 385 F.3d at 515. The Texas Department of Criminal Justice - Correctional Institutions Division has a two-step formal grievance process, including a Step One grievance which is handled within the facility and a Step Two grievance appeal which is handled at the state level. A prisoner must pursue a grievance through both steps for it to be considered exhausted. *Id.* This means that in order for TDCJ-CID inmates to exhaust an issue properly, the issue must be presented in a Step One grievance and then appealed to Step Two. New issues cannot be raised for the first time in a Step Two grievance appeal and only one issue per grievance may be presented. *Randle v. Woods*, 299 F.App'x 466, 2008 U.S. App. LEXIS 24138, 2008 WL 4933754 (5th Cir., November 19, 2008), *citing Woodford*, 548 U.S. at 92- 93 *and Johnson*, 385 F.3d at 515; *see also* TDCJ Offender Orientation Handbook, February 2017, p. 74 (inmates may present only one issue per grievance). The district court may not excuse failure to exhaust available administrative remedies prior to filing a lawsuit under the Prison Litigation Reform Act, even to take "special circumstances" into account. *Ross*, 578 U.S. at 639-40.

The Fifth Circuit has stated that the exhaustion requirement must be interpreted in light of its purposes, which include the goal of giving prison officials "time and opportunity to address complaints internally." *Johnson*, 385 F.3d at 516, *citing Porter v. Nussle*, 534 U.S. 516, 525, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Thus, a grievance is considered sufficient to the extent it "gives officials a fair opportunity to address the problem that will later form the basis of the lawsuit." *Johnson*, 385 F.3d at 517.

The TDCJ Offender Orientation Handbook, available online at https://tdcj.texas.gov/publications/cid_offender_orientation_handbook.html, says that Step One grievances shall be submitted within 15 days from the date of the incident and Step Two appeals shall be submitted within 15 days from the date of the signature on the Step One grievance. Section VII.G.1, p. 7;

*Grim v. Smith*, civil action no. 1:07cv144, 2015 U.S. Dist. LEXIS 37669 (E.D.Tex., March 1, 2015), *Report adopted at* 2105 U.S. Dist. LEXIS 36447, 2015 WL 1383947 (E.D.Tex., March 23, 2015).

In this case, the use of force incident occurred on February 2, 2021, and the disciplinary case was conducted on February 23, 2021. (Docket no. 30, p. 224). Plaintiff's Step One grievance was signed on February 23, making it timely as a challenge to the disciplinary case, but untimely as a grievance concerning the use of force incident. The TDCJ officials interpreted the grievance as challenging the disciplinary case and the grievance was denied on the merits on March 25, 2021.

Plaintiff's Step Two grievance appeal was received in the grievance office on April 15, 2021, 21 days after the Step One grievance was signed. Because this was outside of the time in which to file his Step Two appeal, the grievance appeal was dismissed as untimely. The Fifth Circuit has held that the filing of an untimely Step Two grievance appeal renders administrative remedies unexhausted. *Richardson v. Moore*, 772 F.App'x 208, 2019 U.S. App. LEXIS 19266, 2019 WL 2712903 (5th Cir., June 27, 2019).

Plaintiff argues that he received his Step One grievance back on April 2, wrote his Step Two appeal on April 4, and "gave it to the officer" on April 5, although he does not make clear what officer he allegedly gave it to.[1] There is no "mailbox rule" applicable to prison grievances. *See Welch v. Doe*, civil action no. 6:09cv276, 2009 U.S. Dist. LEXIS 95280, 2009 WL 3335009 (E.D.Tex., October 13, 2009); *Coomer v. Doe*, civil action no. 5:21cv213, 2022 U.S. Dist. LEXIS 240287, 2022 WL 19228834 (N.D.Tex., May 25, 2022), *Report adopted at* 2023 U.S. Dist. LEXIS 48289, 2023 WL 2604804 (N.D.Tex., March 22, 2023), *appeal dismissed*. Plaintiff's Step Two grievance appeal was received by the grievance office on April 15, 2015, rendering it untimely, and it was rejected for this reason. Although Plaintiff points to a March 6 stamp on his copy of the Step Two grievance appeal and contends that this must have been a mistake and the grievance was received on April 6, this is entirely speculative. The grievance office noted the receipt date as April

---

[2] The Offender Orientation Handbook does not provide for giving the grievance to any officer on the unit; rather, it specifies in section VIII.A that the prisoner should place the grievance in the grievance box himself or hand it directly to the grievance investigator on the unit.

10

15, 2021. Because Plaintiff's Step Two grievance was untimely, he failed to exhaust his administrative remedies.

In addition, Plaintiff's Step One grievance was not filed within 15 days of the date of the incident, rendering any use of force issues raised in that grievance untimely. In *Johnson v. Johnson*, 385 F.3d at 519, the prisoner complained of numerous incidents over the course of some 18 months. The Fifth Circuit explained as follows:

> Johnson did not use the formal grievance process - or, rather, he did not properly use it by filing both a Step One grievance *and* appealing the grievance to Step Two - until his March 18, 2001 Step One grievance. We agree with the defendants that Johnson has not exhausted any claims that arise from events that occurred more than 15 days before this grievance. While it is true that the conditions that Johnson suffered both before and after the grievance were of the same general character, to permit the March 2001 grievance to reach back to events that transpired up to six months earlier would effectively negate the state's fifteen-day rule and frustrate the prison's legitimate interest in investigating complaints while they are still fresh. That a condition continues does not excuse the failure to file a grievance earlier. Accordingly, we hold that Johnson's grievances do not permit him to pursue claims regarding conduct that occurred before March 2001 - in particular, this means that he has not exhausted claims related to the UCC meetings of September 6, 2000, December 13, 2000, February 14, 2001, and February 21, 2001, nor has he exhausted claims regarding his encounters with Willingham, which all occurred before March 2001.

A similar situation exists here. Plaintiff's Step One grievance was filed outside of the 15-day deadline for complaining about the use of force, although within the deadline for complaining about the disciplinary case. While it is true that a grievance appealing a disciplinary case can exhaust use of force claims which are properly raised within that grievance, *see Williams v. Estelle Unit Prison Officials*, slip op. no. 23-20036, 2024 U.S. App. LEXIS 14677, 2024 WL 3026778 (5th Cir., June 17, 2024), this fact does not permit Plaintiff to effectively extend the deadline for grieving use of force claims by incorporating untimely use of force claims into a timely grievance challenging a disciplinary case. As in *Johnson*, permitting Plaintiff's grievance to reach back for claims arising past the deadline would effectively negate the state's fifteen-day rule; thus, Plaintiff has failed to

exhaust his use of force claim even apart from the fact that his Step Two grievance appeal was untimely filed.[2]

The use of force of which Plaintiff complains occurred on February 2, 2021, and the disciplinary case was heard on February 23, 2021, meaning that Plaintiff's entire 15-day period in which to file a grievance on the use of force elapsed before the disciplinary case was heard. He does not explain why he did not file a grievance on the use of force, instead waiting until after the disciplinary case was heard, and the time line indicates that he could have grieved both the use of force and the disciplinary case without running afoul of TDCJ's rule against filing more than one grievance in a seven-day period. *Compare Williams*, 2024 U.S. App. LEXIS 14677 at *12 (noting that the prisoner could violate the rule against more than one grievance in seven days if he grieved the use of force and the disciplinary case separately).

In his response to the motion for summary judgment, Plaintiff states that after the use of force on February 2, 2021, he was locked in a cell and remained there until February 9, when he was removed for a trip to Hospital Galveston. The records which he attaches to his response show that he returned to the Beto Unit the next day, February 10. Plaintiff does not allege, much less show, that he was unable to request grievance forms or otherwise file a grievance at any point during the 15 day period after the use of force, which ran through February 17; in fact, Plaintiff filed a grievance on February 12, 2021, concerning his property (docket no. 30, p. 3). Thus, Plaintiff has failed to exhaust his administrative remedies as shown both by the untimely raising of the use of force issue in his Step One grievance, and the untimely filing of his Step Two grievance appeal.

---

[3]In *Williams*, the prisoner filed a grievance ostensibly challenging a disciplinary case but which provided adequate detail concerning the use of force to allow prison officials to investigate. The Fifth Circuit held that this grievance was sufficient to exhaust the prisoner's administrative remedies on his use of force claims. In that case, however, the grievance was filed on the 15th day after the use of force occurred, rendering it timely to raise those claims as well as his challenge to the disciplinary case.

**IV. Conclusion**

On motions for summary judgment, the Court must examine the evidence and inferences drawn therefrom in the light most favorable to the non-moving party; after such examination, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Burleson v. Texas Department of Criminal Justice*, 393 F.3d 577, 589 (5th Cir. 2004). If the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial. *Id.*, *citing Allen v. Rapides Parish School Board*, 204 F.3d 619, 621 (5th Cir. 2000).

The plaintiff cannot oppose summary judgment by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated or speculative assertions, or by only a scintilla of evidence. *Boudreaux v. Swift Transportation Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). There is no genuine issue for trial if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Prison Legal News v. Livingston*, 683 F.3d 201, 211 (5th Cir. 2012).

The court has no obligation to sift the record in search of evidence to support a party's opposition to summary judgment. *Adams v. Traveler's Indemnity Co.*, 465 F.3d 156, 164 (5th Cir. 2008). Instead, a party opposing summary judgment must identify specific evidence in the record which supports the challenged claims and articulate the precise manner in which the evidence supports the challenged claim. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A properly supported motion for summary judgment should be granted unless the opposing party produces sufficient evidence to show a genuine factual issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The summary judgment evidence demonstrates that Plaintiff did not exhaust his available administrative remedies prior to filing suit. The Fifth Circuit has held that exhaustion of available

administrative remedies prior to filing suit is mandatory, and district courts have no discretion to excuse a prisoner's failure to properly exhaust the prison grievance process before filing his complaint. *Gonzalez*, 702 F.3d at 788. This means that a case must be dismissed where, as here, the available administrative remedies were not exhausted. *Id.*

## RECOMMENDATION

It is accordingly recommended that the Defendants' motion for summary judgment (docket no. 28) be granted and the Plaintiff's claims against the Defendants Captain Burks and Sgt. Larsen be dismissed without prejudice for failure to exhaust administrative remedies. Because these are the last remaining claims in the case, it is further recommended that final judgment be entered.

A copy of these findings, conclusions and recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendations must file specific written objections within 14 days after being served with a copy.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's proposed findings, conclusions, and recommendation where the disputed determination is found. An objection which merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific, and the district court need not consider frivolous, conclusive, or general objections. *Battle v. United States Parole Commission*, 834 F.2d 419, 421 (5th Cir. 1987).

Failure to file specific written objections will bar the objecting party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted and adopted by the district court except upon grounds of plain error. *Duarte v. City of Lewisville*, 858 F.3d 348, 352 (5th Cir. 2017).

So ORDERED and SIGNED this 24th day of July, 2024.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE